**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DEANA-LEE FORBES,<br><br>*Plaintiff,*<br><br>vs.<br><br>ADAMS AND ASSOCIATES, INC.; JILL PAYNE; FRED GYASI; MICHAELA POULARD; ABC COMPANIES 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names of presently unidentified individuals),<br><br>*Defendants.* | No.<br><br>**COMPLAINT &**<br>**DEMAND FOR TRIAL BY JURY** |

Plaintiff Deana-Lee Forbes ("Plaintiff"), by way of this Complaint against Defendant Adams and Associates, Inc. ("Defendant AAI" or "Corporate Defendant"), Defendant Jill Payne ("Defendant Payne"), Defendant Fred Gyasi ("Defendant Gyasi"), and Defendant Michaela Poulard ("Defendant Poulard") (collectively, "Individual Defendants") (together with Corporate Defendant, "Defendants") alleges as follows:

**PARTIES**

1.      Plaintiff is a Black woman residing in West Deptford, New Jersey. At all times relevant hereto, Plaintiff was employed by Defendant AAI as an Academic Manager.

2.      Defendant AAI is a corporation organized and existing under the laws of Nevada, with a main business address of 6151 Lakeside Drive, Suite 1000, Reno, Nevada 89511.

3.      Defendant Payne is, at all times relevant hereto, employed by Corporate Defendant as Education and Training Director. This claim is brought against Defendant Payne in her individual capacity and/or as an agent, servant, representative, and/or employee of Defendant AAI during the course of her employment.

4.      Defendant Gyasi is, at all times relevant hereto, employed by Corporate Defendant as Center Director. This claim is brought against Defendant Gyasi in his individual capacity and/or as an agent, servant, representative, and/or employee of Defendant AAI during the course of his employment.

5.      Defendant Poulard is, at all times relevant hereto, employed by Corporate Defendant as Human Resources Manager. This claim is brought against Defendant Poulard in her individual capacity and/or as an agent, servant, representative, and/or employee of Defendant AAI during the course of her employment.

6.      Defendant ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendant, and/or currently unidentified business entities responsible for the creation and/or implementation of anti-discrimination policies of Corporate Defendant, and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced herein.

7.      Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of anti-retaliation and/or anti-discrimination policies of Corporate Defendant and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

### **VENUE**

8.      The causes of action which form the basis of this matter arise under Pennsylvania Human Relations Act ("PHRA") 43 P.S. §§ 951-963 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*

2

9.      The District Court has jurisdiction over Counts I-II (Title VII) pursuant to 8 U.S.C. § 1331 and 42 U.S.C. § 12101, *et seq.*

10.     The District Court has supplemental jurisdiction over Counts III-IV (PHRA) pursuant to 28 U.S.C. § 1367.

11.     Venue is proposed in the District Court under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000(e)-5(f).

12.     The unlawful acts and practices of Corporate Defendants were committed within or upon the direction of Corporate Defendants' agents, servants, employees, and/or representatives within the Commonwealth of Pennsylvania and within this District.

13.     On or about March 27, 2026, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was crossed file with Pennsylvania Human Relations Commission ("PHRC").

14.     On July 22, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.

**FACTS COMMON TO ALL CLAIMS**

15.     Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

16.     Plaintiff is a Black woman.

17.     Defendant AAI operates Job Corps Centers throughout the nation that provide free, residential career training and education programs administered by the United States Department of Labor ("DOL") for low-income young adults between the ages of 16 and 24.

18.     Plaintiff commenced employment with Defendant AAI on October 7, 2024, as an Academic Manager.

19.     At all times relevant hereto, Plaintiff worked at Defendant AAI's Philadelphia Job

Corps Center ("PJCC").

20.    Plaintiff was a stellar employee with a commendable work ethic who was dedicated to the PJCC and its clients.

21.    Despite Plaintiff's demonstrated dedication, Defendants initiated and pursued a course of discriminatory conduct specifically targeting Plaintiff because of her race.

22.    On or about February 6, 2025, Defendant AAI hired Defendant Payne, a White woman, to serve as Education and Training Director.

23.    Defendant Payne became Plaintiff's direct supervisor.

24.    Shortly after assuming her role, Defendant Payne began to engage in conduct and make remarks that reflected race-based discrimination and animus toward Black employees, including Plaintiff.

25.    By way of example and without limitation, in or around February 2025, Plaintiff heard Defendant Payne state that, *as a White woman*, she was coming in to "change things."

26.    By way of further example, in or around March 2025, Defendant Payne approached Plaintiff and stated that Pat Edouard ("Mr. Edouard"), a Black Coordinator for Defendant AAI, hated her because she is White, thereby invoking and reinforcing a stereotype that Black employees are hostile toward White supervisors.

27.    Shortly thereafter, on or about March 13, 2025, Defendant Payne terminated Mr. Edouard.

28.    Based on these events, Plaintiff became concerned that Defendant Payne harbored animus toward Black employees and felt vulnerable as a Black employee under Defendant Payne's supervision.

29.    During the week of March 17, 2025, Defendant Payne served as Acting Center

4

Director at the PJCC.

30. During this time, Defendant Payne became involved in a workplace dispute with Tiffeny Hargrove ("Ms. Hargrove"), a Black woman who served as Dean of Students.

31. Because Defendant Payne was not Ms. Hargrove's direct supervisor, she lacked the authority to discipline her.

32. Instead, Defendant Payne turned her attention to Plaintiff—whom she knew was also Black and worked closely with Ms. Hargrove—and began targeting her.

33. Specifically, on or about March 25, 2025, Defendant Payne called Plaintiff into her office for a meeting and instructed Plaintiff to "kick" Ms. Hargrove out of Plaintiff's office if Ms. Hargrove visited again.

34. When Plaintiff requested an explanation, Defendant Payne claimed that Ms. Hargrove did not need to be in her office and was visiting too frequently.

35. Plaintiff immediately recognized that Defendant Payne's directive lacked any legitimate business justification and was a discriminatory effort to limit and control interactions between two Black employees.

36. The directive was also inconsistent with Defendant Payne's prior departmental email emphasizing an open-door policy for managers.

37. Plaintiff explained that she did not feel comfortable asking Ms. Hargrove to leave her office without a valid reason because Plaintiff's position required regular communication with Ms. Hargrove regarding student-related matters.

38. In response, Defendant Payne questioned whether Plaintiff was being "insubordinate."

39. Plaintiff was shocked that Defendant Payne characterized her response as

"insubordinate" when she was attempting to fulfill her job responsibilities and maintain appropriate professional communication with Ms. Hargrove.

40.     Defendant Payne's discriminatory directive, coupled with her retaliatory accusation of insubordination, reinforced Plaintiff's belief that Defendant Payne intended to discriminate against her based on race and retaliate against her for opposing discriminatory conduct.

41.     Thereafter, Defendant Payne subjected Plaintiff to persistent micromanagement and race-based disparate treatment.

42.     For example, on or about April 17, 2025, Defendant Payne began requiring Plaintiff to act as an intermediary and relay her directives to other managers.

43.     Defendant Payne did not impose this responsibility on similarly situated White managers.

44.     When Plaintiff encountered resistance from other managers while relaying Defendant Payne's directives and sought support, Defendant Payne dismissed her concerns and angrily told her to **handle it herself**.

45.     Plaintiff suspected that Defendant Payne intentionally placed her in this position so she would bear the brunt of the criticism and pushback intended for Defendant Payne.

46.     At the same time, Defendant Payne repeatedly called and texted Plaintiff to question her location at work in an apparent attempt to monitor her movements and limit her interactions with Ms. Hargrove and other Black employees.

47.     Defendant Payne did not subject White employees to the same level of scrutiny, further demonstrating that Plaintiff was being singled out because of her race.

48.     On or about April 30, 2025, Kyle Serfass ("Mr. Serfass"), a White employee who reported to Plaintiff, asked how the Academic Department could achieve the highest gains in Test

of Adult Basic Education ("TABE") scores.

49.     Seeking guidance, Plaintiff relayed the question to Defendant Payne.

50.     Defendant Payne initially responded that "there is nowhere to find that out" and demanded to know who had asked the question.

51.     After Plaintiff disclosed that it was Mr. Serfass, Defendant Payne immediately changed her response, stating, "Oh, ok . . . I think I sent you something about that."

52.     Plaintiff was disturbed that Defendant Payne became cooperative only after learning that a White employee was involved, reinforcing her belief that she was being treated differently because of her race.

53.     On or about May 1, 2025, Plaintiff met with Defendant Payne to inquire about staff assignments and upcoming departmental meetings.

54.     During the meeting, Defendant Payne dismissed Plaintiff's inquiries and directed her to obtain the requested information from Kristin Cloud ("Ms. Cloud"), a White manager for Defendant AAI.

55.     Based on this interaction, Plaintiff understood that Defendant Payne was communicating directly with White managers while excluding her from those same communications.

56.     On May 4, 2025, Defendant Payne emailed Plaintiff asking whether she had attended a corporate TABE meeting held on April 30.

57.     Plaintiff explained that she had been leading a previously scheduled departmental meeting at that time.

58.     Defendant Payne responded that missing the corporate meeting was "very unacceptable" and should have been Plaintiff's top priority.

7

59. Plaintiff was confused by this reprimand, as Defendant Payne had never communicated that the corporate meeting would take precedence over the departmental meeting Plaintiff was responsible for leading.

60. Defendant Payne nevertheless directed Plaintiff to prepare a recap of the corporate meeting for a later meeting that same day.

61. This directive was unreasonable because Plaintiff had not attended the corporate meeting and lacked firsthand knowledge of its contents.

62. Plaintiff suspected that this instruction was intended to embarrass her and portray her as incompetent during the meeting.

63. Despite these circumstances, Plaintiff gathered available information regarding the corporate meeting and prepared a recap.

64. However, when Plaintiff arrived for the meeting to present her recap, no one else was present, signaling to Plaintiff that Defendant Payne had assigned this task solely to micromanage and punish her.

65. Thereafter, Defendant Payne's discriminatory conduct escalated, and she began assigning Plaintiff overlapping responsibilities under unreasonable timelines in an apparent effort to undermine her performance.

66. For example, on May 8, 2025, Defendant Payne instructed Plaintiff to organize an Academic Council Meeting scheduled for the following week.

67. Plaintiff was distressed by the limited timeframe to prepare for such a large-scale event, particularly because, unlike similarly situated managers at other Job Corps centers, she was provided no administrative support for this assignment.

68. On May 12, 2025, while Plaintiff was attempting to organize the Academic Council

Meeting, Defendant Payne directed her to coordinate and plan a visit from a representative of Lincoln University scheduled for May 14, 2025.

69.     Plaintiff was confused by this directive, as such visits were typically handled by the Career Services Department and fell outside her responsibilities as Academic Manager.

70.     Nevertheless, Plaintiff successfully planned and executed the visit while simultaneously preparing for the Academic Council Meeting later that week.

71.     On or about May 13, 2025, Plaintiff followed up with Defendant Payne to confirm whether the Academic Council Meeting remained scheduled for May 16, noting that she had received confirmation from only one prospective attendee.

72.     Defendant Payne instructed Plaintiff to contact local school counselors to secure additional attendees.

73.     Plaintiff advised that, given the short timeframe, it would be difficult to secure additional attendees for the event.

74.     Plaintiff therefore recommended postponing the event to a later date.

75.     Defendant Payne ignored this recommendation and failed to provide any further guidance.

76.     That same day, Defendant Payne removed multiple students who were close to graduating from PJCC's Penn Foster High School Diploma Program ("Penn Foster"), a program overseen by Plaintiff, from their classes.

77.     As an Academic Manager, Plaintiff was responsible for meeting a monthly graduation requirement of at least seven students through Penn Foster.

78.     Plaintiff suspected that Defendant Payne was setting her up for failure by removing these students, thereby jeopardizing her ability to meet the required graduation benchmark.

9

79. When Plaintiff raised concerns about the impact of this decision, Defendant Payne stated that she did not want the students to graduate and leave the program—an explanation inconsistent with Job Corps's stated mission.[1]

80. In a further effort to overwhelm Plaintiff and undermine her performance, on or about May 14, 2025, Defendant Payne assigned her a 90-day TABE audit and directed her to complete it by May 16, 2025.

81. Given the scope and complexity of the audit, and in light of Plaintiff's existing workload—including coordinating both the Lincoln University visit and the Academic Council Meeting—the deadline was unreasonable and appeared designed to ensure failure.

82. Nevertheless, Plaintiff endeavored to complete the audit within the timeframe imposed by Defendant Payne.

83. Later that evening, Defendant Gyasi emailed Plaintiff and Defendant Payne to inquire about the date of the Academic Council Meeting.

84. The following morning, May 15, 2025, Defendant Payne responded that the event would take place the next day and instructed Plaintiff to prioritize securing five additional attendees.

85. Defendant Gyasi replied and directed that the event be postponed until mid-June to allow sufficient time to secure adequate participation, consistent with Plaintiff's earlier recommendation.

86. Plaintiff was frustrated that Defendant Payne had disregarded her recommendation and only agreed to postpone the meeting after Defendant Gyasi intervened.

87. On the morning of May 16, 2025, Defendant Payne summoned Plaintiff and Natalie

---

[1] *See* https://www.dol.gov/agencies/eta/jobcorps.

Heflin ("Ms. Heflin"), a White Counseling Manager, to her office.

88.     Defendant Payne began by consoling Ms. Heflin regarding items flagged during the audit process for her department, stating that the deficiencies were not her fault.

89.     In stark contrast, Defendant Payne's demeanor shifted abruptly when addressing Plaintiff. She yelled at Plaintiff for not completing her audit, stating that her performance was "unacceptable," even though Plaintiff—like Ms. Heflin—was still addressing flagged items.

90.     While Ms. Heflin, a White manager who had not completed her audit, was treated with patience and reassurance, Plaintiff was subjected to hostility and harsh criticism under similar circumstances, reinforcing her belief that Defendant Payne was discriminating against her because of her race.

91.     Plaintiff was also surprised by Defendant Payne's outburst because she had not been given a specific deadline and reasonably believed she had until the end of the day on May 16 to complete the audit.

92.     Plaintiff completed the audit by the end of the day on May 16, 2025, and submitted it to Defendant Payne via email.

93.     Nonetheless, later that evening, after the audit had already been submitted, Defendant Payne emailed Plaintiff to inquire whether it had been completed, further evidence of a pattern of heightened scrutiny and micromanagement.

94.     On May 19, 2025, Plaintiff responded, explaining that she had already submitted the audit but that technical issues related to scanning affected certain required signatures, and that she was in the process of finalizing additional flagged items.

95.     Defendant Payne then imposed a new deadline, directing that Plaintiff finalize the audit by the following day.

11

96.    That afternoon, Plaintiff informed Defendant Payne that she was working diligently but did not believe she could complete the audit by that deadline given its scope and her existing workload.

97.    Defendant Payne instructed Plaintiff to continue working outside normal business hours to meet the deadline.

98.    Defendant Payne did not impose similarly accelerated or unreasonable deadlines on White managers.

99.    In fact, upon reviewing departmental audit materials, Plaintiff observed that she was the only manager assigned a specific and imminent deadline for completion of the audit.

100.    Distressed by this disparate treatment, on May 20, 2025, Plaintiff emailed Defendant Payne and Defendant Gyasi expressing that Defendant Payne's assignments and deadlines appeared designed to set her up for failure.

101.    Plaintiff also spoke directly with Defendant Gyasi, who was understanding and advised her to inform Defendant Payne that she would complete the audit as soon as practicable.

102.    Despite this, Defendant Payne continued to subject Plaintiff to heightened scrutiny, unreasonable expectations, and undue pressure.

103.    On May 21, 2025, physically and mentally exhausted, Plaintiff notified Defendant Payne via text message that she would be taking a sick day.

104.    Defendant Payne acknowledged the message with a thumbs-up response.

105.    However, while Plaintiff was out sick, Defendant Payne emailed Plaintiff, Ms. Cloud, and Ms. Heflin scheduling a managers' meeting for that same day.

106.    In that email, Defendant Payne directed Plaintiff to bring her completed audit results to the meeting.

107.    In contrast, Ms. Heflin was only required to provide a general update regarding her audit findings, further evidencing disparate treatment based on race.

108.    Plaintiff's concern that she was being set up for discipline was soon confirmed.

109.    On May 23, 2025, Defendant Payne issued Plaintiff a verbal warning for allegedly missing her audit deadline, failing to attend the corporate meeting, and failing to plan a TABE event.

110.    Accordingly, on May 27, 2025, Plaintiff submitted a written rebuttal to Salina Smith ("Ms. Smith"), an HR Coordinator for Defendant AAI.

111.    In her rebuttal, Plaintiff explained that she missed the corporate meeting because she was required to lead a previously scheduled departmental meeting at the same time.

112.    Plaintiff further explained that she had planned and coordinated the TABE event, but that technical issues and scheduling conflicts—previously communicated to Defendant Payne—had caused delays.

113.    Plaintiff attached supporting documentation demonstrating her diligence in planning and coordinating the event and her prior communications with Defendant Payne.

114.    Plaintiff also reiterated that the audit deadline was unreasonable, inconsistent with Defendant Payne's expectations of White managers, and discriminatory.

115.    On May 28, 2025, the day after submitting her rebuttal, Defendant Payne entered Plaintiff's office and aggressively demanded that she return her laptop.

116.    The timing and manner of this demand made clear to Plaintiff that Defendant Payne was retaliating against her for submitting the rebuttal and attempting to interfere with her ability to perform her duties, particularly because her use of the laptop had never previously been an issue.

117.    Plaintiff agreed to return the laptop in accordance with standard protocol by

submitting it to the property manager.

118.    When Plaintiff explained that she would follow this procedure rather than immediately surrender the laptop directly to Defendant Payne, Defendant Payne became upset and left the room.

119.    On May 29, 2025, the DOL announced a pause in operations at contractor-operated Job Corps centers nationwide, including the PJCC, with an anticipated shutdown date of June 30, 2025.

120.    On June 3, 2025, Plaintiff received a staff memo stating that employees were limited to performing work essential to the shutdown.

121.    That same day, Plaintiff received an email from corporate leadership directing that all work on Penn Foster be paused and that a student transition plan be completed by June 12, 2025.

122.    The following day, however, Defendant Payne forwarded the email to Plaintiff and asked whether she had completed the Penn Foster transition plan, despite acknowledging that the deadline was June 12, 2025.

123.    Plaintiff was troubled by this inquiry, as it was made only one day after the directive was issued and demanded completion of a task not due for another week, further evidence of Defendant Payne's pattern of micromanagement and discriminatory expectations.

124.    On June 9, 2025, Defendant Payne directed Plaintiff to confirm a list of enrolled students for Penn Foster and to ensure that the Records Department was properly enrolling students in the system.

125.    Plaintiff was distressed by this directive because, as an Academic Manager, she was not responsible for overseeing or verifying the work of the Records Department.

14

126. At that time, the Records Manager had recently resigned due to the impending shutdown, and the Records Department was not prioritizing enrollment because, pursuant to corporate directives, new student enrollment had been paused in advance of the closure.

127. Under these circumstances, Plaintiff suspected that Defendant Payne assigned this task to further micromanage her and set her up for failure.

128. Also on June 9, 2025, Defendant Payne emailed Plaintiff asserting that several students were out of compliance with TABE testing requirements.

129. Plaintiff was surprised by this communication because Defendant Gyasi had previously announced a pause on all TABE testing due to the impending shutdown and had not authorized the resumption of testing.

130. Fearing further retaliation, Plaintiff complied and instructed Wallyah Pierre ("Ms. Pierre"), a Testing and Scheduling Coordinator, to resume TABE testing.

131. That same day, Defendant Payne scheduled a meeting with Plaintiff outside of her scheduled work hours to discuss alleged issues with TABE testing.

132. During the meeting, Defendant Payne harshly criticized Plaintiff and asserted that students were leaving the program without sufficient gains in TABE scores.

133. Defendant Payne further told Plaintiff that she was "letting down" her students and should not feel good about her performance in the Academic Department.

134. Prior to the operational pause—which restricted TABE testing—Plaintiff had consistently achieved TABE gains for her students.

135. When Plaintiff attempted to respond to this accusation and explain that TABE testing had been paused during the shutdown period, Defendant Payne dismissed her and stated that *someone else should be in her position*.

15

136.    Plaintiff was shocked that her performance was being criticized—and her job threatened—based on TABE metrics during a period when testing had been formally paused and student dropouts had increased due to the impending closure of PJCC.

137.    Defendant Payne then asked Plaintiff to explain why certain students still required driver's licenses or permits.

138.    Plaintiff explained that many students do not pass permit examinations on the first attempt and that she had been informed that the PJCC's budget permitted only one student per day to take a driver's license test, causing delays.

139.    Defendant Payne disregarded this explanation and directed Plaintiff to begin scheduling students for driver's license examinations.

140.    Plaintiff responded that she would be willing to do so upon receiving budget approval and requested permission to email the appropriate department to obtain written confirmation.

141.    In response, Defendant Payne became upset and accused Plaintiff of "playing a game," stating that written approval was unnecessary.

142.    When Plaintiff persisted in seeking proper authorization, Defendant Payne ominously stated, "you'll see what will happen if you send the email," which Plaintiff understood as a threat of disciplinary action in retaliation for attempting to follow standard procedures.

143.    At approximately 4:30 p.m., Plaintiff requested to leave the meeting because it had extended beyond her scheduled work hours.

144.    Defendant Payne yelled at Plaintiff and demanded that she stay until 5:00 p.m.

145.    Distressed by Defendant Payne's conduct, and by the lack of response to her earlier rebuttal to the verbal warning, Plaintiff filed a formal complaint on June 10, 2025, with Ms. Smith

16

and Defendant Poulard.

146.    In her complaint, Plaintiff reported that Defendant Payne had created a hostile work environment, subjected her to excessive micromanagement, unfairly targeted her, and treated her differently from similarly situated White managers.

147.    On June 11, 2025, Plaintiff met with Defendant Poulard to discuss her complaint.

148.    During the meeting, Plaintiff detailed her concerns regarding Defendant Payne's discriminatory conduct, and Defendant Poulard assured her that the matter would be investigated.

149.    On June 12, 2025, Plaintiff emailed Defendants Payne and Gyasi requesting support in coordinating student driver permits, reminding them that she had previously been told she would receive assistance with this responsibility, which fell outside her regular duties but had effectively been assigned solely to her.

150.    In response, Defendant Payne stated that coordinating student permits was "a center responsibility which we as management have chosen to be placed under Academics," and confirmed that Plaintiff would remain responsible for the task.

151.    Plaintiff believed that this reassignment of responsibilities—without support and inconsistent with how duties were allocated to White managers—was further evidence of Defendant Payne's discrimination.

152.    Later that same day, Ms. Pierre, also a Black employee, contacted Plaintiff and reported that she felt attacked after Defendant Payne spoke to her in an aggressive tone when she asked which students would be scheduled for testing once TABE testing resumed.

153.    Upon information and belief, Ms. Pierre reported Defendant Payne's conduct to Human Resources.

154.    On June 13, 2025—just three days after Plaintiff filed her HR complaint—

17

Defendant Payne retaliated against her by placing her on a 90-day corrective action plan ("CAP").

155.  The CAP cited Plaintiff for allegedly failing to supervise TABE testing, including ensuring that students were tested regularly and in a timely manner.

156.  The CAP also cited Plaintiff for allegedly failing to timely complete audits—an allegation that Plaintiff had already rebutted as discriminatory.

157.  Plaintiff was dismayed by the CAP, as it failed to account for the pause on TABE testing, her documented success in achieving TABE gains prior to the pause, and the unreasonable and disparate audit expectations imposed upon her.

158.  On June 16, 2025, Defendant Gyasi sent an email to Plaintiff and Defendant Payne, confirming that the center was prohibited from resuming TABE testing until July 1, 2025.

159.  In that email, Defendant Gyasi noted that the Academic Department had made "good strides on TABE compliance over the past few months," thereby confirming that Plaintiff's performance had been satisfactory and undermining the legitimacy of the CAP issued by Defendant Payne.

160.  Defendant Gyasi further acknowledged that "as of today no one is fully sure how the new TABE test will be administered," highlighting the uncertainty surrounding TABE procedures and further demonstrating that Defendant Payne's criticism and discipline of Plaintiff for alleged TABE deficiencies were unjustified and pretextual.

161.  Accordingly, on June 16, 2025, Plaintiff met again with Defendant Poulard to raise concerns that the CAP was discriminatory and retaliatory, and that Defendant Payne continued to subject her to excessive scrutiny through frequent communications regarding matters outside her control during the operational pause.

162.  Defendant Poulard again assured Plaintiff that an investigation was ongoing.

163. Plaintiff, however, lacked confidence in Defendant Poulard and HR, particularly because she had submitted a rebuttal to her verbal warning weeks prior and had received no response.

164. Accordingly, following the meeting, Plaintiff called Todd Skocki ("Mr. Skocki"), an Education and Training Director in Defendant AAI's corporate office, to report that she was being pressured to meet unreasonable expectations, deadlines, and TABE compliance requirements during the operational shutdown period.

165. During that call, Mr. Skocki acknowledged that managers should exercise flexibility during the operational pause and reassured Plaintiff that no center was operating under normal conditions and that many of the expectations imposed on her were outside of her control.

166. On June 17, 2025, Defendant Payne instructed Plaintiff that, although she was responsible for conducting student scheduling meetings, such meetings could no longer take place in her office and that Defendant Payne would be required to attend all such meetings going forward.

167. Plaintiff was confused by this directive because she had previously been advised that scheduling meetings were informal, brief check-ins with the scheduler to ensure student schedules were prepared for the following week—a practice she had consistently followed since the start of her employment.

168. Defendant Payne also required Plaintiff to submit weekly emails detailing step-by-step changes to each student's schedule.

169. Defendant Payne did not impose similar restrictions or reporting requirements on White managers.

170. Notably, despite insisting that she attend all scheduling meetings, Defendant Payne

19

attended only one, demonstrating that the directive was not based on legitimate operational needs but was instead a pretext for increased surveillance and disparate treatment.

171. On or about June 23, 2025, Plaintiff met with Defendants Payne and Poulard to review her CAP.

172. During the meeting, Defendants advised Plaintiff that she had allegedly failed to correct the deficiencies identified in the CAP.

173. Plaintiff was confused by this assertion and questioned how she could have completed the required corrective actions while TABE testing remained on pause.

174. Defendant Payne responded only that Plaintiff should make the corrections once the pause ended.

175. On or about June 26, 2025, the DOL lifted the pause on Job Corps center operations.

176. The following day, June 27, 2025, Plaintiff was informed by Defendant Poulard that her work schedule would be changed to 8:00 a.m. to 4:30 p.m.

177. When Plaintiff expressed concern that this schedule would prevent her from ensuring her staff's timely arrival—given that her staff reported at 7:30 a.m.—Defendant Poulard assured her that she could arrive at 7:30 a.m. to supervise her team.

178. However, on June 30, 2025, Plaintiff received a letter from Defendant Gyasi stating that her schedule would instead be 8:00 a.m. to 5:00 p.m., directly contradicting Defendant Poulard's prior representation.

179. Upon information and belief, Defendant Payne recommended this schedule change during a meeting with Defendant Gyasi.

180. Confused by the inconsistent directives, Plaintiff met again with Defendant Poulard, who stated that all managers were required to have a 5:00 p.m. end time.

181.    Plaintiff observed, however, that Ms. Cloud was permitted to work a schedule of 6:30 a.m. to 3:30 p.m., contradicting Defendant Poulard's assertion that all managers were subject to the same scheduling requirements and confirming that she was being treated differently from White managers.

182.    Plaintiff requested the same accommodation afforded to Ms. Cloud—namely, the ability to begin her workday earlier so she could supervise staff arrivals.

183.    Defendant Payne denied this request and instead instructed Plaintiff to have Ms. Cloud oversee her staff's arrivals.

184.    On July 2, 2025, Defendant Payne sent an email to Plaintiff, Defendant Gyasi, and Defendant Poulard criticizing Plaintiff for allegedly failing to submit her findings within 24 hours of completing her monthly teacher observations.

185.    Plaintiff responded that she had completed all required findings and had never been informed of any requirement to submit such findings within a 24-hour timeframe.

186.    Plaintiff was distressed that Defendant Payne issued this criticism in an email copied to senior leadership rather than addressing the matter directly with her, particularly in the absence of any prior notice of the alleged requirement.

187.    Rather than provide clarification or support regarding Defendant Payne's inconsistent and discriminatory expectations, Defendant Gyasi sided with Defendant Payne and instructed Plaintiff to "eliminate . . . back and forth [emails with Defendant Payne] as much as you can. It gets tiring . . . ."

188.    Plaintiff was dismayed by Defendant Gyasi's response, as it dismissed her legitimate concerns and signaled that he would not intervene to address or prevent Defendant Payne's ongoing discriminatory and retaliatory conduct.

21

189.    Shortly thereafter, in or around early July 2025, Plaintiff was scheduled to meet with Defendants Poulard, Payne, and Gyasi to discuss her HR complaint.

190.    Prior to the meeting, Defendant Poulard advised Plaintiff that she was not the only employee who had complained about Defendant Payne.

191.    Defendant Poulard further stated that she had not received support from Defendant Gyasi regarding those complaints.

192.    While Plaintiff was waiting in the conference room for the meeting to begin, she overheard Defendant Gyasi instruct Defendant Poulard to cancel the meeting because it was *not necessary*.

193.    Plaintiff was crestfallen by Defendant Gyasi's comment, as it signaled that her concerns regarding persistent race-based discrimination and retaliation were being dismissed and would not be taken seriously.

194.    While the meeting proceeded as scheduled, Plaintiff felt that her concerns were being ignored, as Defendant Gyasi appeared uninterested and disengaged throughout the meeting.

195.    Ultimately, Plaintiff left the meeting feeling as though nothing had been accomplished.

196.    On July 11, 2025, Plaintiff became ill and used her accrued paid time off to cover her absence.

197.    On July 14, 2025, Plaintiff informed Defendant Payne that she was still sick and would use sick time for that day.

198.    In response, Defendant Payne instructed Plaintiff that she would be required to provide a doctor's note upon her return to work.

199.    Plaintiff was confused by this instruction because she had previously been informed

22

that a doctor's note was only required after three consecutive sick days.

200.    Accordingly, while still ill, Plaintiff contacted Defendant Poulard to clarify this alleged requirement.

201.    Defendant Poulard confirmed that Plaintiff was only required to provide a doctor's note after three consecutive sick days.

202.    Defendant Payne's directive was another instance of micromanagement and disparate treatment, as it imposed requirements inconsistent with established policy and unnecessarily burdened Plaintiff while she was out sick.

203.    On or around July 17, 2025, Plaintiff submitted a formal complaint via email to Defendant AAI's Corporate HR department reporting Defendant Payne's persistent harassment, micromanagement, and race-based discrimination.

204.    In response, Kim LaGrand-Moore ("Ms. LaGrand-Moore") acknowledged receipt of the complaint and assured Plaintiff that Corporate HR would "look into it."

205.    Regrettably, Ms. LaGrand-Moore never followed up with Plaintiff regarding her complaint.

206.    On or about July 24, 2025, Defendant Payne called Plaintiff into a meeting to discuss coordinating student driver's licenses and permits.

207.    During the meeting, Plaintiff provided her ideas on how the process could be more effective and once again asked for administrative support in coordinating student licensures.

208.    Defendant Payne disregarded Plaintiff's proposals, provided no guidance, and instructed her to seek assistance from the Career Preparation Planning Department ("CPP").

209.    When Plaintiff contacted the CPP, it declined to assist and advised that it would only transport students to the Department of Motor Vehicles for testing once per month.

210. Plaintiff relayed this information to Defendant Payne, who became upset and stated that she did not care and that the responsibility for coordinating student licensures remained with Plaintiff.

211. After further persistence, Defendant Payne assured Plaintiff that she would speak with the CPP to facilitate assistance.

212. However, when Plaintiff followed up with the CPP, the department informed her that Defendant Payne had not contacted them regarding the matter.

213. Plaintiff continued to request support from Defendant Payne, but each time was redirected to other departments that either lacked the capacity or declined to assist, after which Defendant Payne reiterated the same ineffective instructions.

214. As a result, Plaintiff was left to manage the responsibility without administrative support, further impeding her ability to carry out a task that fell outside her regular job duties, creating additional stress and reinforcing a pattern of discriminatory and retaliatory conduct.

215. On July 24, 2025, Plaintiff submitted a complaint to Defendant Poulard, reporting that Defendant Payne was harassing her through her handling of the driver's license and permit process—scheduling meetings to discuss progress, dismissing her ideas, and providing no guidance or support—and that this harassment appeared retaliatory in light of her recent complaint to Corporate HR.

216. Defendant Poulard merely asked whether Defendant Payne had sent her a reminder email about one of the scheduled meetings and did not address Plaintiff's substantive concerns.

217. Discouraged that Defendant Poulard would not remediate her concerns, Plaintiff advised that she would attempt to meet with Defendant Payne one final time regarding the driver's license and permit responsibilities.

218.    On August 14, 2025, Defendant Payne sent an email to Plaintiff criticizing her for allegedly failing to hold her staff accountable for tardiness.

219.    Plaintiff reiterated that her modified work schedule had impaired her ability to monitor staff arrivals and supervise punctuality.

220.    Defendant Payne did not respond to Plaintiff's explanation.

221.    Accordingly, Plaintiff forwarded the email to Defendant Poulard and reiterated that this issue was the very reason she had previously requested to maintain her earlier schedule.

222.    Defendant Poulard likewise failed to respond.

223.    Thereafter, in or around late August 2025, Plaintiff sent a follow-up email to Corporate HR requesting an update on her prior complaint regarding Defendant Payne. Plaintiff received no response.

224.    On August 28, 2025—approximately three months after submitting her rebuttal to Defendant Payne's verbal warning—Defendants Gyasi and Poulard agreed to meet with Plaintiff to discuss her rebuttal.

225.    During the meeting, Defendants dismissed Plaintiff's rebuttal, sided with Defendant Payne, and upheld the discriminatory verbal warning.

226.    In doing so, Defendant Gyasi stated, "Let's not always confuse accountability with targeting," effectively dismissing Plaintiff's concerns regarding discriminatory and retaliatory treatment.

227.    When Plaintiff reiterated that Defendant Payne was discriminating against her, Defendant Gyasi dismissively suggested that she *pursue legal action against Defendant Payne*.

228.    Plaintiff left the meeting distressed and with the clear understanding that her complaints would not be meaningfully addressed and that Defendants would continue to support

and endorse Defendant Payne's conduct.

229. Later that same day, Plaintiff met with Defendant Payne to discuss her progress under the CAP.

230. During that meeting, Defendant Payne acknowledged that Plaintiff had made significant progress, including:

   a. Improving TABE compliance;

   b. Demonstrating increased commitment to achieving outcomes;

   c. Encouraging teachers to better serve students;

   d. Making substantial improvements in case management practices; and

   e. Completing required audits.

231. The only remaining alleged deficiency identified by Defendant Payne was that classrooms were not sufficiently organized and clean; however, Defendant Payne acknowledged that Plaintiff had already prepared a plan to address this issue.

232. Despite Plaintiff's progress and near completion of the CAP's original objectives, Defendant Payne added new requirements to the CAP.

233. Specifically, Defendant Payne asserted that Plaintiff needed to plan field trips to enhance student engagement.

234. Plaintiff was confused by this addition, as she had already planned and executed two field trips during the CAP period.

235. Defendant Payne's addition of new requirements to the CAP—despite Plaintiff's documented progress—was pretextual and part of an ongoing effort to micromanage her and manufacture grounds for further discipline.

236. By September 10, 2025, Plaintiff had cleaned and organized all classrooms, thereby

satisfying the final remaining requirement of her original CAP.

237. On or about September 17, 2025, Plaintiff met with Defendants Poulard and Payne to discuss her initial HR complaint.

238. During the meeting, Defendants failed to address Plaintiff's concerns. Instead, Defendant Payne became loud and aggressive, repeatedly speaking over Plaintiff when she attempted to articulate her complaints.

239. At one point, Defendant Poulard attempted to calm Defendant Payne; however, Defendant Payne continued her aggressive and confrontational conduct toward Plaintiff.

240. During the same meeting, Plaintiff asked Defendant Payne about information she had learned from Ms. Cloud during the operational pause indicating that Defendant Payne planned to relocate Plaintiff's office.

241. Defendant Payne confirmed that she intended to move Plaintiff's office.

242. Plaintiff was concerned by this decision, as relocating her office away from her staff would hinder her ability to effectively supervise, communicate with, and support them, thereby making it more difficult to perform her job duties and potentially impacting her performance.

243. When Plaintiff pressed for a reason, Defendant Payne stated that the move was intended to place Plaintiff closer to Ms. Cloud.

244. Later that afternoon, Defendant Payne sent a follow-up email to Plaintiff, Defendant Poulard, and Defendant Gyasi confirming that Plaintiff's office would be relocated the following week.

245. In her email, Defendant Payne stated that the move was necessitated by the return of students and staff—providing a different justification than the one she had offered during the

meeting.

246.    On September 18, 2025, Plaintiff responded to the email and expressed concern that she had not been included in the initial decision-making process and had instead learned of the planned move through Ms. Cloud.

247.    Plaintiff further explained that the relocation would distance her from her students and staff and impair her ability to effectively perform her supervisory responsibilities.

248.    Plaintiff also noted that the decision mirrored Defendant Payne's earlier modification of her work schedule, which had similarly limited her ability to supervise her staff.

249.    Defendants did not respond to Plaintiff's email.

250.    Based on the foregoing, Plaintiff suspected that Defendants were continuing to discriminate against her on the basis of race and were taking steps to marginalize her role, undermine her performance, and position Ms. Cloud to assume greater control over her responsibilities.

251.    On or about September 19, 2025, Plaintiff was scheduled to meet with Individual Defendants to discuss her ongoing concerns of discrimination and retaliation.

252.    Defendant Gyasi scheduled an interview to take place at the same time as the meeting and advised that he would not be able to attend.

253.    Plaintiff did not feel comfortable attending the meeting without Defendant Gyasi present and requested that the meeting be postponed to ensure his participation.

254.    When the meeting later took place, Defendant Gyasi appeared uninterested, signaling to her that he was not taking her concerns seriously and had decided to side with Defendant Payne.

255.    Just two weeks later, on October 3, 2025, Plaintiff was called into a meeting and

28

terminated by Individual Defendants.

256.    Individual Defendants did not provide Plaintiff with a reason for her termination or an official termination letter.

257.    Plaintiff was forced to repeatedly follow up with Defendant Poulard to obtain her termination letter and understand the alleged basis for her termination.

258.    On October 29, 2025, Plaintiff finally received her termination letter, in which Defendant Gyasi claimed that she was terminated for allegedly failing to successfully complete the CAP.

259.    Plaintiff immediately recognized this purported reason as pretextual, as she had completed all of the items on her initial CAP—which Defendant Payne had acknowledged—as well as the additional items that Defendant Payne discriminatorily added.

260.    Plaintiff was terminated in retaliation for her complaints of race discrimination and ongoing harassment.

261.    The temporal proximity between Plaintiff's repeated complaints and her termination raises a strong inference of retaliation.

## COUNT ONE
## TITLE VII – DISCRIMINATION AND DISPARATE TRETAMENT DUE TO RACE
### (Against Corporate Defendant)

262.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

263.    Plaintiff was subjected to discrimination by Defendants on account of her race.

264.    At all relevant times, Plaintiff was qualified for her position.

265.    Plaintiff is a Black woman.

266.    Plaintiff was subjected to disparate treatment because of her race.

29

267. The above-described conduct would not have occurred but for Plaintiff's race and complaints of racial discrimination.

268. The acts, failures to act, and conduct of Defendants set forth above constitute unlawful discrimination on the basis of Plaintiff's race, in violation of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

269. Said violations were intentional and willful.

270. As a result of the above discriminatory conduct, Plaintiff experiences ongoing and debilitating emotional distress and experiences significant economic damages.

**WHEREFORE**, Plaintiff, respectfully demands judgment in her favor and against Defendants, and seeks all appropriate remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended, including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

**COUNT TWO**
**TITLE VII – RETALIATION**
**(Against Corporate Defendant)**

271. The preceding paragraphs are incorporated by reference as if fully set forth.

272. The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended.

273. Defendants retaliated against Plaintiff for engaging in protected activities, namely, for reporting racial discrimination.

274. Defendants, by and through its employees, retaliated against Plaintiff for having exercised her rights under federal and state law.

275. Said violations were intentional and willful.

276.     As a result of the above discriminatory conduct, Plaintiff experiences ongoing and debilitating emotional distress and experiences significant economic damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor and against Defendants and seeks all appropriate remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended, including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

**COUNT THREE**
**PENNSYLVANIA HUMAN RELATIONS ACT (PHRA) – DISPARATE TREATMENT & DISCRIMINATION DUE TO RACE**
**(Against All Defendants)**

277.     Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

278.     The acts, failures to act, and conduct of Defendants set forth above constitute unlawful discrimination on the basis of race in violation of Plaintiff's rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

279.     The pattern and practice of discrimination and retaliation directed at Plaintiff is outlined above.

280.     During the course of her employment with Corporate Defendant, Plaintiff demonstrated she was qualified and performed the essential functions of her position.

281.     During the course of her employment with Corporate Defendant, Plaintiff was subjected to discrimination and disparate treatment—with regard to the terms, conditions, and privileges of her employment— on the basis of race.

282.     The above-described conduct would not have occurred but for Plaintiff's race and/or complaints about racism and microaggressions.

283. Defendants did not have an effective anti-discrimination policy in place, Defendants have not maintained an anti-discrimination policy that is current and effective, and Defendants' anti-discrimination policy existed in name only.

284. Defendants did not maintain useful formal and informal complaint structures for victims of discrimination.

285. Defendants did not properly train their supervisors and/or employees on the subject of discrimination and retaliation.

286. Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

287. Defendants did not have a commitment from the highest levels of management that discrimination will not be tolerated.

288. As a result of the above discriminatory conduct, Plaintiff experiences ongoing and debilitating emotional distress and significant economic damages.

289. As the employers and/or supervisors of Plaintiff, Individual Defendants are vicariously, strictly, and/or directly liable to Plaintiff pursuant to the PHRA, in that the affirmative acts of discrimination committed by Individual Defendants occurred within the scope of their employment; and/or Defendants were deliberately indifferent, reckless, negligent and/or tacitly approved the discrimination; and/or Defendants failed to create and/or have in place well-publicized and enforced anti-discrimination policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms for same despite the foreseeability of discrimination in the workplace; and/or by having actual knowledge of the discrimination of Plaintiff and failing to promptly and effectively act to stop it.

290. Corporate Defendant aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Individual Defendants to commit acts and omissions that were in violation of the PHRA by committing affirmatively discriminatory acts towards Plaintiff in violation of their supervisory duties to halt or prevent discrimination, subjecting Defendants to liability to Plaintiff pursuant to 43 P.S. § 955(e).

291. Individual Defendants aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Corporate Defendant to commit acts and omissions that were in violation of the PHRA by committing affirmatively discriminatory acts towards Plaintiff in violation of their supervisory duties to halt or prevent discrimination, subjecting Individual Defendants to liability to Plaintiff pursuant to 43 P.S. § 955(e).

292. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor and against Defendants and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

<u>**COUNT FOUR**</u>
<u>**PENNSYLVANIA HUMAN RELATIONS ACT – RETALIATION**</u>
<u>**(Against All Defendants)**</u>

293. Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

294.    The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising her rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

295.    Plaintiff engaged in a protected activity when she complained and/or protested against the continuing course of discriminatory and retaliatory conduct set forth at length above. Defendants had knowledge about those complaints and/or protests.

296.    The retaliation directed at Plaintiff included but is not limited to, requiring Plaintiff to endure racism as a condition of employment and terminating Plaintiff's employment when she reported workplace racism and microaggressions.

297.    Plaintiff was affirmatively terminated by Defendants in retaliation for making complaints about Defendants' conduct and due to Defendants' failure to take corrective and remedial action. As a direct result, Defendants took retaliatory action against Plaintiff, which is outlined above.

298.    The close temporal proximity between Plaintiff's protected activity and Defendants' adverse employment action establishes causation.

299.    As a direct and proximate cause of the Defendants' unlawful acts and omissions as previously mentioned, Plaintiff has been discharged from her position of employment with Corporate Defendant.

300.    Individual Defendants are vicariously, strictly and/or directly liable to Plaintiff for unlawful retaliatory conduct in violation of the PHRA pursuant to 43 P.S. § 955(e).

301.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor and against Defendants and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

Dated: July 28, 2026     By:     /s/ *Matthew A. Luber*
Matthew A. Luber, Esq. – PA ID No. 309323
William A. Carr, Esq. – PA ID No. 200274
McOMBER McOMBER & LUBER, P.C.
50 Lake Center Drive, Suite 400
Marlton, NJ 08053
Phone: (856) 985-9800
Fax: (856) 263-2450
mal@njlegal.com
wlc@njlegal.com
*Attorneys for Plaintiff, Deana-Lee Forbes*

35